FILED

MAR 0 2 2026

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO CLEVELAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

ROBIN JOHNSON,                                          Case Number: 1:25 cv-01689

Plaintiff,

Judge:  Solomon Oliver Jr.

v.

CITY OF CLEVELAND, et al.,

## Fourth Amended Complaint

**INTRODUCTION**

1.  **Plaintiff** Robin Johnson, proceeding Pro Se, brings this **Fourth Amended Complaint** for unlawful discrimination, retaliation, defamation and denial of procedural Due Process.  This action is brough pursuant to **Title VII of the Civil Rights Act of 1964 (42 U.S. § 2000e), 42 U.S.C. § 1983, the CROWN Act (Cuyahoga County Ordinance No. 02025-0004, amending Cuyahoga County Code § 1501.02**

2.  This case arises from a pattern of discriminatory and retaliatory conduct targeting Plaintiff's protected characteristics, including her race, sex and use of protective hairstyles (wigs), and from adverse actions taken after Plaintiff engaged in protected activity opposing such discrimination

1

3. This action also arises from a false complaint submitted to Internal Affairs, which initiated an unlawful investigation and ultimately forced the constructive discharge of the Plaintiff. The initial inaccurate, misleading complaint and investigative actions were carried out by **Sgt Eugene Young** (Officer in Charge) and **Sgt Dahlia Lopez** (Internal Affairs Investigator). These actions were furthered and ratified through an administrative process involving Superintendent **Jennifer Meyer** and **Ariel Flores** (HR Employee Relations)

4. The Process was finalized by **Chief Dorothy Todd**, the 42nd Police Chief of the Cleveland Division of Police. As the final decision-maker for the Division, Chief Todd's implementation of discipline—or the failure to intervene---constitutes the final official policy of the **City of Cleveland**, giving use to municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978)

**HISTORICAL CONTEXT: TIGNON LAWS AND SUMPTUARY LAWS**

5. The discrimination in this case is rooted in a long historical pattern of policing and controlling the appearance of Black women's hair. In 1786, the Governor of Louisiana enacted the "Tignon Laws" a form of Sumptuary Law, which required Black women, both enslaved and free, to cover their hair with a scarf or wrap in public. Plaintiff realleges and incorporated by reference the preceding paragraphs.

6. Sumptuary Laws more broadly were regulations that restricted certain people from wearing clothing, hairstyles, or adornments, often based on race, such as natural curls, braids, wigs and protective styles.

7. Today, Title VII and the Ohio Civil rights Act protect individual from discrimination based on hair texture and protective hairstyles. Wigs are a recognized protective style used to shield natural hair. Defendant Young's comments demanding Plaintiff "remove her wig or weave and

"just wear her natural hair" constitute racial harassment by targeting a racial characteristic forcing the alteration of a protected style.

8. Recent legal and social advocacy, including the passage of the CROWN Act and high-profile discussion by figures like Michelle Obama in 2025, emphasizes that the policing of Black hair—including the use of wigs, braids and extensions- is a tool of professional discrimination that the law now explicitly seeks to end.

9. The 2025 CROWN Act simply "codifies" (puts into written law) what was already protected under the Civil Rights Act of 1964. Public figures and advocates, such as Michelle Obama in her 2025 advocacy for the CROWN Act, have highlighted how the policing of Black hair—including wigs and protective styles—continues to be a tool of professional discrimination.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction pursuant to **28 U.S.C. §§ 1331 and 1343**, as this action arises under **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and 42 U.S.C. § 1983**. This Court has supplemental jurisdiction over Plaintiff's state and local law claims—including those under **Ohio Revised Code § 4112** and the **CROWN Act (Cuyahoga County Ordinance No. O2025-0004)**—pursuant to **28 U.S.C. § 1367**, as they arise from the same common nucleus of operative facts.

11. **Venue** is proper in this Court pursuant to **28 U.S.C. § 1391(b)** because the events giving rise to these claims occurred in Cleveland, Ohio, within the Northern District of Ohio, Eastern Division.

12. **Administrative Exhaustion & Relation Back**

Plaintiff has exhausted her administrative remedies. Plaintiff timely filed a charge of

discrimination with the **EEOC**. The EEOC issued a **Notice of Right to Sue** on June 3, 2025 (See Exhibit 2). Plaintiff's original complaint was timely filed within 90 days of receipt of said Notice. This Third Amended Complaint relates back to the original filing pursuant to **Fed. R. Civ. P. 15(c)**, as the claims against all Defendants arise out of the same conduct, transactions, and occurrences set forth in the original pleading.

**PARTIES**

13. Defendant, the City of Cleveland, is a municipal corporation organized under the laws of the State of Ohio and operates the Cleveland Division of Police (CDP).

14. Defendant Sgt. Eugene Young is an officer employed by the CDP and was an Officer in Charge at all relevant times. He is sued in his individual and official capacities

15. Defendant Sgt. Dahlia Lopez is an investigator employed by the CDP's Internal Affairs Unit. She is sued in her individual and official capacities

16. Defendant Jennifer Meyer served in a Superintendent role within the CDP's Internal Affairs Unit at all relevant times. She is sued in her individual and official capacities

17. Defendant Dorothy Todd is the Chief of the Cleveland Division of Police. She is sued in her individual and official capacities

18. Defendant Ariel Flores is employed by the Department of Human Resources/Employee Relations. He is sued in his individual and official capacities

19. The Defendants listed about were responsible for Plaintiff's employment, including investigations, discipline, and adverse employment actions. Individual defendants are being sued in both their individual and official capacities. At all relevant times, the individual Defendants were acting under color of state and local law and within the scope of their

4

employment. These Defendants were responsible for Plaintiff's employment, including investigations, discipline, and the adverse employment actions described herein.

## STATEMENT OF FACTS

20. Plaintiff began her employment with the City of Cleveland starting in June of 2019, and was later was transferred to the Cleveland Division of Police (CDP) on May 31, 2024. Defendant Young sat in on the Interview. Lt Rick Stone called Plaintiff to schedule interview, order Plaintiff to go be fingerprinted, signaling his hire choice, performed onboarding, issued Plaintiffs passwords, gave Plaintiff parking information including his parking space, **(See Ex 12)**

21. During Plaintiffs probationary period from June 5, 2024 – 9/11/2024 Defendant Young engaged in a pattern of unwelcome behavior, including making flirtatious noises toward Plaintiff while she was standing at the timeclock.

22. On September 11, 2024, Plaintiff successfully completed her probation with performance evaluations rating her as "exceeding expectations" in appearance and professional grooming, and satisfactory in performance **(See Exhibit 15)**

23. Despite these objective records, Defendant Young later falsely claimed on a Complaint Form 1, that Plaintiff "finished probation with a lot of conversation and debate. This statement was never disclosed to Plaintiff during her evaluations and was made with defamatory and retaliatory intent.

24. On September 12, 2024, Defendant Young sat in close proximity to Plaintiff and stated to another employee that he "could do more for Plaintiff than for the other employee, as the other person is already rich." When Plaintiff failed to reciprocate this unwanted attention, Young disparaged her appearance, stating another woman was 'more attractive' and Plaintiff was "just regular".

5

25. The events of September 11th and 12th 2024, served as the triggering events for a continuous and escalating campaign of harassment. This timeline demonstrates, that as soon as Plaintiff achieved the permanent status of completing probation, Defendant Young transitioned from unwelcome flirtation to overt professional sabotage and disparagement.

26. This immediate shift in treatment created a hostile and intolerable work environment that was the direct and proximate cause of the subsequent administrative actions and Plaintiff's eventually forced constructive discharge.

27. On September 14, 2024, Defendant Young posted a derogatory offensive discriminatory post (not video as later shown to Internal Affairs) on his public Facebook page Young's commentary targeted Black women who wear wigs, stating they should "remove their wigs and be themselves." With a picture of 5 Black women removing their wigs. Plaintiff reasonably perceived this post –targeting her protected racial characteristic and hairstyle—as discriminatory and contributing to a hostile work environment.

28. Pursuant to GPO 1.10.01 (**Social Media Policy See Exhibit 19)** all members are required to notify a supervisor of policy violations. Plaintiff complied with this requirement by notifying Defendant Young (10/22/2024), Lt Rick Stone and Sgt Gillard and Plaintiffs Union, Local 100 (10/14/2024)

29. Defendant Young's conduct also violated GPO 1.1.03 (Standards of Conduct and Courtesy), which mandates that Division members must be "resourceful and polite" and prohibits speech that would "reasonably tend to diminish the esteem of the Division" or its personnel. By publicly disparaging the Plaintiff on social media, Defendant Young directly violated these standards, and management's failure to enforce GPO 1.1.03 further ratified the hostile work environment.

30. These notifications triggered a mandatory duty for supervision to investigate and take remedial action, which Defendants failed to fulfill.

31. On Sept 15, 2024, Defendant Young physically intimidated Plaintiff by standing in a doorway and refusing to move, forcing Plaintiff to brush past him to reach her work area.

32. On September 16, 2024, Young asked Plaintiff if she was "free that evening", which Plaintiff did not respond.

33. On or about Sept 20, 2024 Defendant Young approached Plaintiffs desk and made offensive, false statements regarding her sexual orientation and gender identity. Stating "I know you're a homosexual, then "I know you're really a man"

34. September 22, 2024, Young again approached Plaintiffs desk to mock a medical condition (alopecia). Plaintiff purposely did not respond to these incidents in an attempt to maintain her employment.

35. On September 29, 2024, Defendant Young initiated unsolicited contact with Plaintiff outside of working hours via Facebook Messenger, referring to her as "gorgeous" **(See Exhibit 6).** Although Defendant Young later falsely alleged that Plaintiff was 'pursuing" him by working overtime on his assigned shift, official payroll records demonstrate that Defendant Young himself approved Plaintiff's overtime request for those specific shifts **(See Exhibit 26 Pg 1-8).**

36. On Sept 30, 2024 Defendant Young Followed Plaintiff to a private "Singles Group. He obtained Group information from Plaintiffs FB page. He greeted Plaintiff and stated where he lived. **(See exhibit 6)**

37. On October 3, 2024, Plaintiff sent Young a polite, friendly message stating that the office was not the same without him there. Plaintiff was purposely trying to be polite in hopes of changing the hostility in the office. This was not pursuit, or intended as such.

7

38. On October 9, 2024 Defendant Young pressured Plaintiff to send him a Facebook friend request. Plaintiff eventually complied solely to de-escalate tensions and alleviate her anxiety regarding Young's persistent requests.

39. On Oct 14, 2024 after viewing the discriminatory post regarding Black women's hair on Young pinned" posts, Plaintiff felt overwhelmed by the ongoing harassment. She submitted a letter of resignation, surrendered her departmental keys, work ID directly to Young, and contacted her Union. Young forwarded the resignation letter to Commander McGuth. **(See Exhibit 7)**

40. On Oct 15, 2024 Plaintiff blocked Defendant Young from her Facebook **Page** (See Exhibit 17). Upon the advice of her Union Representative, Plaintiff rescinded her resignation. Her Commander authorized the recission, noting that Plaintiff is a "great addition to the department" **(See Exhibit 7).**

41. On October 16, 2024, when Plaintiff sought a mandatory signature for an overtime sheet, Defendant Young acted with open hostility, shouting at Plaintiff, from his desk. While Defendant Young sarcastically stated "have a nice day" his tone and volume were objectively abusive and unprofessional. This was not a misunderstanding; it was a continuation of the hostile work environment. Plaintiff subsequently sent a message to Defendant Young expressly advising him that his behavior was creating a hostile work environment and was the reason she had attempted to resign the previous day **(See Exhibit 6)**

42. Plaintiff's October 16, 2024 messages to Defendant Young –explicitly identifying his behavior as the cause of the hostile work environment—constitutes **Protected Activity** under Title VII and O.R.C. § 4112.

43. Plaintiff, reiterated that Young's ongoing conduct was the reason for her initial resignation on October 14, 2024. In response, Young provided his personal cell phone number and instructed her to "call whenever you feel" despite the availability of office phones (**See Exhibit 6).** This communication further constitutes Protected Activity, as it provided Defendant with direct notice of Plaintiff's opposition to the unlawful environment.

44. The timing of Defendants Youngs October 28, 2024 Complaint Form 1 and the subsequent initiation of the Internal Affairs investigation on October 29, 2024 and 11/4/2024 recorded Internal Affairs interview, occurring less than 2 weeks after Plaintiffs protected activity on October 16, 2024 and October 22, 2024, demonstrates a clear retaliatory motive. These actions were taken in direct response to Plaintiff opposing the hostile work environment and were designed to silence her and justify her constructive discharge.

45. On Oct 22, 2024, while Young was on furlough (10/ 21/2024 – 10/28/2024) Plaintiff sent him a message reporting that she saw his Facebook post regarding Black women taking off their wigs and being themselves. (not video that Young later shows Internal Affairs investigator) to Young through Messenger (See Exhibit 6) (Also see Final Report Top of Pg 12 of 29). Plaintiff also states she heard what Young would say when he came to her desk, even though Plaintiff usually had to ignored him.

46. On October 24, 2024 Plaintiff and Defendant Young **exchanged** messages regarding his discriminatory post. During this exchange, Plaintiff remained professional and polite, while Young confirmed his awareness of the offensive content but maintained a dismissive and retaliatory posture toward Plaintiff's concerns (**See Exhibit 6)**

47. Minutes after message exchange, Plaintiff left a recorded voicemail for Defendant Young. In this recording –later reviewed by Internal Affairs---Plaintiff's tone is objectively professional

9

and courteous.  She addressed him as "Sgt young" and explicitly requested a constructive discussion regarding the messages they had just exchanged. **(See Exhibit 18)**

48. **Immediately following** the voicemail, Plaintiff spoke with Defendant Young directly.  She expressed that she felt humiliated, intimidated and offended by his social medial post.  At no point during this conversation did Plaintiff raise her voice, use profanity, or exhibit "fury" or "anger".

49. **Defendant Young's Demonstrably False and Pretextual Allegations**

On or about October 2024, Defendant Young submitted a formal Complaint Form 1 to Internal Affairs and provided a recorded interview to Defendant Lopez, IA investigator. These statements contained multiple demonstrably false allegations intended to mischaracterize Plaintiff's conduct and trigger a retaliatory investigation. Specifically:

**A. Fabrication of Demeanor:** Young falsely alleged Plaintiff was "angry and furious." Objective audio evidence proves Plaintiff remained professional; Young's use of these specific descriptors was a pretextual attempt to invoke the "Angry Black Woman" racial stereotype to discredit Plaintiff's protected activity.

**b. False Claim of Initiation:** Young's Complaint states he "merely responded" to Plaintiff 'messages. In truth, Young initiated the digital communication on September 29, 2024. Young knew this claim was false at the time of filing as he was in possession of the text thread **[See Exhibit 6].**

50.  Falsehoods regarding Rumors and Interactions: In his written Complaint, Young denied sharing rumors with Mildred Artis about Plaintiff. However, in his IA interview with Lopez, he admitted that he and Artis discussed rumors regarding Plaintiff **[See Exhibit 12].** Young further fabricated that he had to instruct Plaintiff to "stop contacting him," a directive that has no

10

evidence only Young saying that he said this in his recorded IA interview. Young never instructed Plaintiff to stop contacting him. Young did say "You have my number, you can contact me there for work purposes." **(See Exhibit 6)**

**d. Concealment of Harassment:** Young falsely characterized Plaintiff's inquiries—where she asked if she had "offended" him—as harassment. In reality, these inquiries were a direct response to Young's own misconduct, including his frequent trips to Plaintiff's desk to make inappropriate and offensive statements regarding Plaintiff's gender and medical condition (e.g., "I know you're really a man," and "I know you have alopecia").

**e. Proximate Cause of Harm and Retaliation Defendant** Young's false statements were the **proximate cause** of the retaliatory Internal Affairs investigation, which would not have been initiated but for these fabrications.

**f. Knowledge of Falsity:** Defendant Young acted with actual malice; he knew his claims were false because they were directly contradicted by the text messages, audio recordings, and his own prior admissions to LT Stone.

**g. Publication and Defamation:** These lies were published to LT Stone and entered into the public record via the IA Complaint Form 1, causing permanent damage to Plaintiff's professional reputation.

**h. Sustained Harm:** As a direct and legal result of these sustained falsehoods, Plaintiff has suffered significant harm, including a retaliatory investigation, loss of professional standing, and severe emotional distress. The investigation was sustained based entirely on Young's fabricated narrative rather than objective evidence.

11

**51.** During the subsequent investigation, Defendants Sgt Dahlia Lopez and Superintendent Jennifer Meyer had access to the audio recordings and message logs.  Despite this objective evidence proving Plaintiff's composure and Youngs lack of credibility, these Defendants moved forward with 'sustaining" charges against Plaintiff.

52.The disciplinary process was finalized by Defendant Chief Dorothy Todd.  By ratifying findings that contradicted the recorded evidence, Defendant Chief Todd adopted the retaliatory motive as the official policy of the City of Cleveland.

53. On 10/26/2024 Plaintiff reported the discriminatory social media post to Lt Rick Stone and Sgt Gillard in great detail.  In violation of the City's own procedures, Plaintiff was not instructed to complete a Complaint Form or report the incident to Human resources.  At the time of this report, Plaintiff had been employed by the department for 5 months but had never received training on any-antidiscrimination or anti-harassment policies during her entire employment with the City of Cleveland **(See GPO and HR Anti-Discrimination / Anti-Harassment Policy Exhibit 19).**

54.On 10/28/2024 Plaintiff received a series of, what she felt as threatening and homophobic text messages from an unknown number.  The messages used profanity, questioned Plaintiff's gender and sexual orientation and contained death threats. Plaintiff immediately showed these messages to her Officer in Charge (OIC), Sgt Gillard, who advised her to file a police report at one of the police districts.  He stated he as an OIC was not able to take the report.  Plaintiff filed reports with the City of Cleveland **(See Exhibit 10)** as she was an employee of this City.  As well as the City of Cleveland Heights, as Plaintiff lives in this city.  This was done on November 2, 2024. **(See Final Report Page 17 of 29)** For the City of Cleveland Police Report I named no suspects,

12

but spoke privately with the officer about who I thought made the calls. I wanted to be responsible and wait for the calls to be traced. In the Cleveland Heights Police report I was told I needed to list a suspect, so I complied with what the Officer their told me. and listed who I thought it was. **(See Final Report Exhibit 11 Pgs. 17 and 18** Police Reports made on 11/2/2024). Plaintiff does not believe that this is purposely spreading false allegations. Plaintiff acted in good faith and with a reasonable belief based on the similarity of the slurs used in the threats to those previously used by Defendant Young.

55.The Internal Affairs investigation was initiated by supervisory personnel and was not part of a union grievance proceeding.

56.Also, on 10/28/2024, Defendant Young returned to work from furlough and immediately created and filed a Complaint Form 1 **(See Exhibit 1)** against Plaintiff, alleging "Telecommunications Harassment." In the Complaint, Young characterized Plaintiff's previous report of discrimination as "ramblings" and used dismissive, uncorroborated labels and untrue statements such as "unruly", "having abnormal behavior, "very paranoid" to name a few. Young is not a psychiatrist or psychologist to diagnose Plaintiff. Defendant Young's labels ("abnormal behavior, very paranoid") were prejudicial and lacked any clinical or evidentiary basis, yet they were adopted by the city as fact. This is what Young called Plaintiffs messages reporting discrimination, protected activity.

57.On the Complaint Form 1, Defendant Young further implies that Plaintiff worked overtime on his shift to "pursue him" this is demonstrably untrue, as Young himself approved Plaintiff's overtime sheets, as well as other OIC on other shifts, this shows she worked various shifts not just Youngs. **(See Exhibit: 26 Overtime Sheets).**

13

58. Youngs Form 1 Complaint falsely stated that Plaintiff had "run-ins" with other staff members. As Young was never Plaintiffs direct supervisor, he lacked personal knowledge of her day-to-day performance: his statements were based on hearsay and were intentionally defamatory.

59. The City **ignored** the Chief Prosecutor's findings of insufficient evidence for Telecommunications Harassment. Despite the Chief Prosecutor's formal determination that no harassment occurred, the City proceeded with an Internal Affairs investigation based on the same rejected allegations.

60. This Complaint Form 1 created by Defendant Young, was widely distributed via email to the Commander, Chief of Police, FOP, Lieutenant Rick Stone, and Internal Affairs, also becoming a Public Record.  The distribution of these false and stigmatizing allegations, following Plaintiff's protected opposition to Young's discriminatory social media post, constitutes a clear act of retaliation and defamation.

61. At the time Defendant Young filed his retaliatory complaint, the City of Cleveland maintained a General Police Order (GPO) and Human Resources Social Media Policy prohibiting employees from posting discriminatory, offensive, or disparaging content that could harm the reputation of the Division or create a hostile work environment **(See GPO and HR Social Media Policy Exhibits 19)**

62. Despite Plaintiff specifically reporting Defendant Young's social media post --- which targeted black women and protective hairstyles--- to multiple supervisors (Lt. Stone and Gillard and providing evidence to Internal Affairs, the City of Cleveland took no disciplinary action against Defendant Young for this clear violation of Policy.  Also, in Defendant Dahlia Lopez

14

official Final Report, **(See Pg. 3 of 29)** She clearly states 'Sgt Eugene Young posted an offensive video on Facebook."

63.The City's failure to enforce its Social Media Policy against Defendant Young, while simultaneously initiating a high-level Internal Affairs investigation into Plaintiff based on Youngs uncorroborated claims, demonstrates a selective enforcement of policies and further evidence of a retaliatory and discriminatory motive.

64. At all relevant times, the City of Cleveland maintained a GPO 1.1.03 Standards of Conduct and Courtesy. This policy mandates that Division members be "courteous and respectful in their speech, conduct and contact with others" and prohibits any conduct or speech, on or off duty, which would "reasonably tend to diminish the esteem of the "Division" or involve "disparaging conversation detrimental to the Division of Police or its personnel".

65.Defendant Youngs social media post and video shown to Interna Affairs **(See Exhibit 12)** – which mocked Black women protective hairstyles—and his subsequent false and disparaging statements in the Complaint Form, constitute direct violations of GPO 1.1.03. His behavior was neither courteous nor respectful and served to diminish the esteem of the Division as well.

66. Furthermore, the City of Cleveland's **(See Exhibit 22)** Anti-Discrimination and Anti-Harassment Policy (updated March 25, 2024) prohibits "intimidating acts" and the circulation or posting of written or graphic materials that show hostility toward individuals because of their protected status". This policy explicitly applies to all City employees and prohibits retaliation for good -faith reports of such conduct.

67.Despite the clear violations of GPO 1.1.03 and the Anti-Discrimination Policy, the City of Cleveland took no disciplinary action against Defendant Young. The City's decision to ignore

15

these violations while using Youngs uncorroborated claims to investigate and discipline the Plaintiff demonstrates a discriminatory and retaliatory application of its own conduct and courtesy standards.

68. On October 29, 2024 Internal Affairs ("IA") initiates an investigation into Defendant Youngs complaint This investigation began only one day after the complaint was filed, reflecting an unusually rapid response by the Division.

69. In conducting its investigation, IA repeatedly referenced and relied upon Ohio's Telecommunications Harassment statute. This was done despite the fact that no criminal charge, citation, arrest, probable cause determination, or prosecutorial referral was ever made against Plaintiff.

70. IA framed the investigation using criminal-law terminology and implications, creating the false and stigmatizing impression that Plaintiff's conduct was criminal. This invocation of the statue was a **pretext** used to support an alleged violation of Manual Rule 2.01 (General Conduct rather than a legitimate criminal inquiry.)

71. The IA Final Report acknowledges that the communications at issue included **mutual**, non-work -related messaging between Plaintiff and Defendant Young. These messages including messages initiated or continued by Defendant Young outside of work hours. Messages from 10/22/2024-10/25/2024 were work related issues.

72. Internal Affairs (IA) documented that Defendant Young failed to set professional boundaries, continued to message Plaintiff, and delayed blocking her on social media: however, IA failed to meaningfully weight these facts against Defendant Young. As Young violated the departments own no fraternizing policy.

16

73. IA selectively characterized Plaintiff's conduct as improper while excusing or minimizing comparable or worse conduct by Sgt Young, despite his supervisory authority and the power imbalance inherent in the relationship.

74. IA relied upon unverified workplace rumors despite Defendant Young's inability to identify a source or confirm their accuracy, and IA failed to independently corroborate these rumors before using them to justify escalating the investigation.

75. The IA Final Report inaccurately minimized Plaintiff's tenure with the City of Cleveland by referencing only her start date with the Division of Police, ignoring her previous years of municipal employment and thereby undermining her professional credibility.

76. Ultimately, IA relied on the vague language of Manual Rule 2.01 to sustain finding in the absence of any clear policy violation or criminal offense.

77. Plaintiff submitted public records request for 5th District video footage relevant to the allegations, however, the City of Cleveland failed to provide this evidence despite its relevance.

78. IA reached investigative conclusions and adverse credibility determinations without providing Plaintiff access to said video footage or a meaningful opportunity to review and respond to it or any of the investigative findings prior to closing the investigation.

79. Plaintiff was never interviewed by IA during the investigation, depriving her of a fair and meaningful opportunity to be heard or to clarify ambiguities in the evidence.

80. On November 4, 2024 Defendant Sgt Lopez interviewed Defendant Sgt Young. During this recorded interview, Young provided contradictory statements regarding workplace "rumors" at

one point claiming they did not exist and later attributing them to a coworker named Mildred Artis/Ortiz. (See Exhibit: Interview 11/4/2024)

81.Defendant Young alleged he received three calls on the morning of October 25, 2024. Although one-call purportedly displayed Plaintiff's name, IA never verified metadata for the tow private calls and never investigated whether the named call was an accidental "pocket dial"

82. Even if a call was placed, it did not constitute "harassment" as Defendant Young had explicitly authorized Plaintiff to call "whenever you feel" on October 16, 2024 (See Exhibit 6)

83. Defendant Young provided contradictory testimony regarding the emotional impact of these calls, stating first that he was "traumatized and could not sleep" but later admitting he went back to sleep, because he had a funeral to attend the next day. **(See Internal Affairs video Exhibit 12)**

84.November 4. 2024 During the IA interview when Young was asked what my messages were about, Young then presented a new video version of his discriminatory Facebook **still post,** featuring Black women removing wigs set to the song Circle of Life/Animal Kingdom **(See Exhibit 12).** He did not present the post that Plaintiff saw, reported to him and sent several reporting messages about.

84. The use of this specific audio—which in its original cinematic context features images of animal / monkeys---when applied to Black women and their hair, constitutes a subtle and derogatory racial comparison that any reasonable person would find discriminatory.

85.On November 4, 2024, Defendant Lopez characterized Plaintiffs perception of the aforementioned post as "subjective", effectively dismissing a report of racial harassment in violation of the City's Anti- Discrimination Policy.

18

86. Defendant Lopez's dismissal of Plaintiff's report as 'subjective" demonstrates a failure to conduct a culturally competent investigation into racial harassment.  By ignoring the specific historical and racial connotations of the "Circle of Life" audio paired with images of Black women's removing wigs, Defendant Youngs commentary, Defendant Lopez—who does not share Plaintiff's protected racial characteristics—failed to apply the 'objective reasonable person' standard required by Title VII".

87.Defendant Lopez stated in her Final Report that Defendant Young posted an offensive post.

**(See Exhibit 11 Top of Page 3 of 29)**

88. Plaintiff never received the requested video footage, despite its relevance and her repeated requests. Plaintiff seeks said video footage from 5th District, Police Department 89. Internal Affairs reached investigative conclusions and made adverse credibility determinations without providing Plaintiff access to the video or any meaningful opportunity to review, clarify, or respond to the evidence.

90.By denying Plaintiff access to relevant evidence, and accepting Plaintiff's, Internal Affairs deprived her of a fair and meaningful opportunity to be heard, further demonstrating a predetermined and biased investigative process.

91. Upon information and belief, the Cleveland Division of Police maintains video footage relevant to the allegations at issue.

Internal Affairs relied upon or had access to investigative materials, including electronic and recorded evidence, in reaching its conclusions.

Plaintiff was never interviewed by Internal Affairs, was never presented with the evidence relied upon, and was never afforded an opportunity to review or respond to such materials.

19

92. IA reached adverse credibility determinations and investigative conclusions without first allowing Plaintiff to explain her account, clarify ambiguities, or review the evidence purportedly supporting the allegations.

93. The failure to interview Plaintiff or provide access to the evidence relied upon deprived Plaintiff of a meaningful opportunity to be heard or provide evidence she was in possession of.

94. During the investigation, IA relied on redacted phone records, as reflected in the Internal Affairs Final Report previously submitted to the Court. Despite drawing adverse conclusions regarding Plaintiff's credibility from these records, IA or Public Records, did not provide Plaintiff with unredacted or underlying data sufficient to verify the accuracy of the alleged communications. Plaintiff requested access to such records but was not provided them, depriving her of a meaningful opportunity to respond.

95. On November 4, 2024, Defendant Lopez conducted a biased interview with Defendant Young, her coworker and fellow officer.

96. During the interview, Young provided conflicting accounts regarding workplace "rumors" and attributed unverified, uncooberated information to a coworker, Mildred Artis/Ortiz, which constitutes hearsay **(See Exhibit: Interview 11/4/2024)**

97. Young's claims regarding early morning calls on October 25, 2024, were accepted as fact despite the lack of metadata verification and the dismissal of simple alternative explanations, such as a misdial or pocket dial,

98. Defendant Lopez failed to ask Plaintiff about these calls during the investigation.

99. The investigation ignored that Young previously gave Plaintiff permission to call him "whenever you feel" on October 16, 2024.

20

100. Defendant Young made contradictory statements about being "traumatized" by the calls, saying he could not sleep after receiving the calls, later admitting he went back to sleep because he had a funeral the next morning, confirmed sleep by saying, he woke up the next day and attended the funeral.  facts which IA documented but did not weigh against his credibility.

101. During the interview, Young presented a recorded video of his discriminatory Facebook post, featuring Black women removing their wigs set to the 'Circle of Life' song.

102. The use of this specific audio track, which in its original cinematic context features images of animals and monkeys, creates a discriminatory comparison that any reasonable person would perceive as racial harassment and a violation of the CROWN Act.

103.  November 4, 2024 Internal Affairs Investigator Lopez conducted a recorded interview with Defendant Young. In the **Lopez Synopsis**, Lopez characterizes Plaintiff's perception of Defendant Young's discriminatory post as "subjective." However, this characterization is contradicted by the **Official Final Investigative Report**, which ultimately determined that Defendant Young did, in fact, post "offensive" content in violation of Departmental policy. This discrepancy is vital, as it highlights that while investigators may have initially minimized Plaintiff's concerns as personal "opinion," the objective evidence resulted in a **Sustained finding** against Plaintiff. Also note:  The **GPO Social Media Policy** was never enforced.   (See Social Media Policy Exhibit 19)

104. The messages on 10/25/2024, used to establish sustained findings, evidence relied upon consisted of unverified logs and messages that lacked **essential metadata**, including timestamps, origin routing data, and the sender's identity.

21

105. The communications in question originated from a telephone number **other than the Plaintiff's**, a fact the Investigator willfully ignored.

106.. Defendant relied solely on the hearsay statement of [Witness Lopez], who claimed to "have seen calls on Young's device. Such testimony only confirms the *receipt* of a call, not the *identity* of the sender. (See Recorded Interview on 11/4/2024 conducted by Sgt Lopez)

107. City investigations are required to gather "testimonial, documentary, and forensic evidence". By skipping the "forensic" part and relying on flawed "documentary" evidence **(unverified screenshots)**, they violated their own defined investigative process.

108. On 11/4/2024, Internal Affairs Investigator Lopez conducted a recorded interview with Defendant Young. In the **Lopez Synopsis**, Lopez characterizes Plaintiff's perception of Defendant Young's post as "subjective." However, this characterization is contradicted by the **Final Investigative Report**, which ultimately determined that Defendant Young did, in fact, post "offensive" content in violation of Departmental policy. **(See Social Medial Policy Exhibit 19)** This discrepancy is vital, as it highlights that while investigators may have initially minimized Plaintiff's concerns as personal "opinion," the objective evidence resulted in a **Sustained finding** against Plaintiff. Plaintiff noticed that Young attempted to interject humor when saying Black Women should remove their wigs and just wear their natural hair. Young needs to be a mature man and respect that this situation is not humorous. Seemingly have to correct himself with whatever gesture the investigator gave off camera, in regards to the remark.

109. On November 5, 2024 Plaintiff was transferred to Accident Records, where her training stopped.

22

110. On November 6, 2024, while an Internal Affairs investigation was active, Defendant Young published a retaliatory video to his public TikTok page (Gene_Gene_In_Ohio). The video featured a photo of Defendant Young with the captions) **Block you huh? Nah, you're going to watch me win Bitch**" (See Exhibit 13)

111. Plaintiff discovered this video after her constructive discharge. This newly discovered evidence confirms that the retaliatory scheme and hostile environment were ongoing and that management failure to act—despite mandatory duties under GPO 1.10.01 had emboldened Defendant Young to continue his public harassment instructions given by Lt. Rick Stone on October 24, 2024, directing Young to block the Plaintiff. (See Exhibit 12-Internal Affairs Interview Audio)

112. Defendant Young's conduct also violated GPO 1.1.03 (See Exhibit 18 Standards of Conduct and Courtesy), which mandates that Division members must be "resourceful and polite" and prohibits speech that would "reasonably tend to diminish the esteem of the Division" or its personnel. By publicly disparaging the Plaintiff on social media, Defendant Young directly violated these standards, and management's failure to enforce GPO 1.1.03 further ratified the hostile work environment.

113 On 12/5/2024 Plaintiff's constructive discharge

114.. On January 23, 2025 Chief Prosecutor Jordan declines charges of Telecommunication Harassment against Plaintiff, stating insufficient evidence. (See Exhibit 9).

115. On or about February 14, 2025, Plaintiff received a letter from Defendant Ariel Flores (HR/Employee Retaliations) summarily stating that no harassment or discrimination had occurred and that the cases were closed.

23

116. Despite multiple scheduled interviews being canceled by HR (See Exhibit 14), Defendant Flores closed the investigation without ever interviewing the Plaintiff. (See Exhibit 14).

117. On or about February 17, 2025, Defendant Flores issued an "Incident Summary Report" that erroneously referred to Plaintiff as "Robin Young" and adopted the Internal Affairs findings as HR's own conclusion (See Incident Summary Report on Pg 23 of 29 of the Final Report by Defendant Lopez). Flores closed the investigation without interviewing the Plaintiff. This failure to follow standard HR procedures is evidence that the investigation was a pretext for retaliation.

118. February 17, 2025 The Internal Affairs Final Report, contained multiple false statements and relied exclusively on evidence provided by Defendant Young (See Exhibit 11).

119. Defendant Lopez created a conflict of interest by simultaneously presiding over Defendants administrative investigation and managing Plaintiffs' private citizen police reports. This dual role compromised the neutrality required for a fair investigation.

120. Defendant Lopez's Final Report misleadingly referenced phone records with the originating numbers "blacked out" making it impossible to verify the actual source of the 34 calls alleged against Plaintiff.

121. Defendant Lopez took Plaintiff's messages out of context, focusing on one statement while ignoring the contemporaneous phone call where Plaintiff explicitly told Defendant Young she was "hurt, embarrassed and offended" by his post. Ignoring the many messages to Young saying I was offended **(See Exhibit  6)**

24

122. Despite Defendant Lopez acknowledging in the "Discovery" section of the report that Young's post was 'offensive", the City failed to enforce its GPO Social Media Policy or issue any discipline to Defendant Young.

123. Defendant Lopez improperly utilized the "Telecommunication Harassment" statute as a pretext to sustain a violation of Manual Rule 2.01 under "preponderance of the evidence standard.

124. In a deceptive attempt to show compliance with investigative standards, Defendant Lopez "merged" statements from Plaintiff's separate police district report into the IA Final Report to create the false appearance that an actual IA interview with Plaintiff had occurred.

125. The IA Final Report contained altered documents, including the relocation of messages and the removal of a "heart emoji" originally sent by Defendant Young,

126. The City of Cleveland permitted an Internal Affairs investigator to handle external criminal reports to steer the administrative outcome, effectively using the investigative process as a pretext for retaliation.

127. This video was posted just days after Defendants Youngs, recorded Internal Affairs interview, Plaintiff reporting Young Facebook post to Young and other Superiors, and after Plaintiff Blocked him on her Facebook **Page** on 10/15/2024 (See Exhibit 6) (Far before Young blocked Plaintiff on Facebook **Messenger** on 10/24/2024.) (See Exhibit 6)

128.. In the Internal Affairs Recorded Interview, Defendant Young clearly states that Acting Lt Rick Stone told him to block Plaintiff.  Young states he blocks and unblock Plaintiff.

25

129. Defendant Youngs use of a gender -based slur and his aggressive, public targeting of subordinate colleague are **egregious** violations of **GPO 1.1.03 (Standard of Conduct and Courtesy Exhibit 18) and GPO 7.03.03 (See Social Media Policy Exhibit 19).**

130. On or about March 17, 2025 Defendant Jennifer Meyer issued a letter to Plaintiff stating that, based on a 'preponderance of the evidence' the Internal Affairs findings against Plaintiff were "sustained/closed/resigned".

131. These sustained findings explicitly violated **GPO 1.07.07 (Retaliation Prohibited),** which protects any member who files a complaint alleging misconduct or provides testimony" from adverse action Explicitly protects any member who "files a complaint alleging misconduct or provides testimony" from adverse action. (See Retaliation GPO Policy Exhibit 20)

132. By acting against a protected individual for engaging in protected activity, Defendants findings were retaliatory in intent and were contrary to their own written policies.

133. Prior to this final determination, Plaintiff was never provided a Garrity interview or any meaningful opportunity after constructive discharge to present evidence, rebut Defendant Youngs Complaint Form 1 fabrications, or provide her account of the events to Internal Affairs.

134. **GPO 1.07.08 (See Exhibit 21 Bias-Free Policing):** Mandates that supervisors who fail to address complaints of bias-based policing **"will be subject to discipline"**. The department's failure to punish Defendant Young while sustaining findings against Plaintiff was a violation of their own internal mandate.  (See Bias Free Policing GPO Policy Exhibit 21)

135.  Upon receiving the letter from Meyer, Plaintiff contact Meyer directly to protest the lack of due process, however, Defendant Meyer acted with unprofessional hostility, stating "Young

26

doesn't want to talk to you anymore," and refused to provide any information regarding the basis of the finding.

136. Defendant Meyer's refusal to allow Plaintiff to be heard, combined with her instruction that Plaintiff must file a "Public Records Request" to learn why she was being disciplined, constitutes a final ratification of a biased and unconstitutional investigative process (See Exhibit 5 Meyer Letter/Public Records request emails)

137. On or about March 17, 2025: **Chief Dorothy Todd**, acting in her official capacity, reviewed an internal investigation into the conduct of the Plaintiff, Robin Johnson. Chief Todd officially approved **"Sustained"** findings against Plaintiff based on a **"Preponderance of the Evidence"** standard.

138. These findings alleged that Plaintiff's actions violated **Cleveland Division of Police Manual Rule 2.01** (Conduct Unbecoming) and were ostensibly linked to the **Telecommunications Harassment** statute (O.R.C. § 2917.21). Thereby implying a that there was a criminal charge where none existed.

139. Under GPO 1.01.01 (Duties of Command) superior officers, including Chief Todd, are held to a "higher standard" of conduct. By approving these "Sustained" findings against a protected activity and implying a non – existent criminal charge, Chief Todd failed to meet this higher standard and ratified the retaliatory conduct of her subordinates.

140. Plaintiff asserts that these "Sustained" findings were **pretextual** and **retaliatory**. While the Department used these findings to label Plaintiff's conduct as "harassment," the record demonstrates that **Defendant Young initiated the outside contact**. Through his own admission. Furthermore, there is no documented evidence or recorded proof—not even within Defendant

27

Lopez's final report—that Defendant young ever instructed the Plaintiff to cease contact during the October 24, 2024 conversation. Therefore, the findings were a bad-faith attempt to silence the Plaintiff and justify her constructive discharge.

141.Specifically: On September 29, 2024, Defendant Young initiated contact with Plaintiff via Facebook Messenger. (See Exhibit 6). Please note, Final Report Pg 9 of 29 is falsified. The report shows Plaintiff's profile picture and Defendant Youngs message initiating contact, merged together. The original messages show the correct order (See Exhibit 6 September 29, 2024 date).

142. Furthermore, the "Sustained" findings against Plaintiff failed to account for the fact that **Commander McGuth** had previously ordered both Plaintiff and Defendant Young to cease all contact, including eye contact. By sustaining findings only against the Plaintiff for "harassment" while ignoring Young's role as the initiator and his subsequent false statements to IA, the Department—through Chief Todd's approval—engaged in **disparate treatment** and furthered a hostile work environment.

143. Plaintiff notes that while she likely would have faced formal disciplinary action based on these sustained findings had she not resigned, Defendant Young—the initial aggressor—faced no such disciplinary jeopardy for his underlying discriminatory posts or his false statements to investigators.

144. **Failure of HR Oversight – Ariel Flores:** The Internal Affairs investigation was referred to **Ariel Flores**, an Employee Relations representative for the City's Department of Human Resources. Flores was tasked with conducting an independent investigation into Plaintiff's claims of harassment and discrimination.

28

145. **Violation of Internal Policy:** Pursuant to the City's own written policies, Plaintiff was entitled to an investigative interview to present her evidence and testimony. Although Flores scheduled multiple interview dates with Plaintiff, he **systematically cancelled every scheduled meeting. There are many emails between Plaintiff and Ariel Flores that speak to this truth** (See Exhibit 14)

146. **Admission of Procedural Failure:** In his final **Incident Summary Report**, Flores explicitly admits that Plaintiff was **never interviewed** by his office or the DHR. By failing to interview the complainant, Flores denied Plaintiff the ability to defend herself against the false allegations made by Defendant Young or to substantiate her own claims. (See Exhibit 14 or Final Report Pgs. 23 and 24) for Incident Summary Report)

147. **Bias and Inflammatory Mischaracterizations:** Despite never interviewing the Plaintiff, Flores authored an Incident Summary Report containing **inflammatory and defamatory language** that was made available for public viewing. In this report, Flores:

148. Defendant Flores report falsely alleged that Plaintiff was involved in a pattern of harassing and unprofessional behavior directed at Defendant Young, including the misuse of Facebook, personal cell phone, and city email.

149. These claims are contradicted by objective audio evidence **(See Exhibit 12).** Plaintiff never misused any communication platform: rather, all communication was work-related or a good – faith attempt to de-escalate the hostile work environment created by Defendant Young.

150. the allegations of 'misuse of City email" is baseless, as Plaintiff sent only one work-related email to Defendant Young. Email use from a subordinate to a supervisor is permissible under Division Policy.

151. The allegation of "misuse of cell phone" is unverified.  Plaintiff never saw any metadata linking the late-night private calls to her personal number, and the single call displaying her name must have been an accidental misdial.

152. Internal Affairs Investigator Defendant Lopez rushed to sustain Telecommunication Harassment" findings without ever interviewing the Plaintiff or investigating simple alternative explanations for the calls.

153.The report incorrectly states that Plaintiff accused Young of spreading rumors: rather Plaintiff stated in a private message that Young was 'contributing to the spread of rumors" and was "offensive on a regular basis" which was a protected attempt to resolve a workplace concern.

154. Plaintiff and Defendant Young had a mutual conversation about rumors on October 24, 2024 and the subsequent messages were on October 25, 2024, was a continuation of that dialogue, not harassment.

155.  Plaintiff, was never explicitly instructed by Defendant Young to cease contact at the time of these communications, Plaintiff was reasonably under the impression that addressing and attempting to resolve a workplace matter in this manner was an acceptable and necessary course of action

156. Plaintiff filed an initial police report with the Cleveland Division of Police (CPD) regarding telecommunications harassment and menacing behavior.

157. At the instruction of Sgt Gillard (Officer in Charge), Plaintiff sought to document the harassing messages at a district level

30

158. During the report filing at CPD, Plaintiff initially withheld Defendant Young's name pending a trace of the calls, which is documented in the district's recorded video.

159. Plaintiff identified Defendant Young as the suspect based on the use of specific slurs and language previously used by him directly toward Plaintiff.

160. Plaintiff subsequently filed a report with the Cleveland Heights police Department, where she formally identified Defendant Young as the suspect as required by department reporting procedures.

161. **Adoption of Tainted Findings:** Defendant Flores failed to conduct an independent Human resource review and instead adopted the Internal Affairs findings in their entirety as his own.

162. Defendant Flores and the Department of Human resources (DHR) closed both Plaintiff's and Defendant Young's cases simultaneously without conducting a formal investigative interview, as required by their own policy, with the Plaintiff.

163. By failing to perform an independent investigation and ignoring procedural safeguards, Defendants Flores and DHR ratified the existing hostile work environment.

164. Retaliatory Intent: These actions were part of a retaliatory scheme intended to silence Plaintiff's protected conduct and prevent a full inquiry into her claims.

165. Plaintiff's employment with the City of Cleveland ended as a direct result of the hostile work environment and retaliatory actions described herein, which made continued employment untenable.

166. Following her departure, Plaintiff acted in good faith to mitigate her damages by securing alternative employment with the Federal Government.

167. At the time of securing federal employment, Plaintiff fully intended to fund her own legal counsel for this matter.

168. Subsequent unforeseen changes within the Federal Government, necessitated Plaintiff's resignation from that position, resulting in a significant change in her financial status and her subsequent application for In Forma Pauperis (IFP) status. \

169. Plaintiff was constructively discharged in December 2024, as the hostile work environment and retaliatory conduct by Defendants made her continued employment intolerable.

170. At the time of her resignation, Plaintiff did not intend to pursue legal action and instead prioritized securing new employment to mitigate her damages.

171. Plaintiff did not become aware of the full extent of the false allegations, internal affairs investigation and procedural failures against her until receiving public records in **May 2025, well after her constructive discharge with the City of Cleveland.**

172. Upon discovering this information, Plaintiff promptly initiated contact with the EEOC and pursued her claims within the required legal timeframes.

173. Defendant Young, in his capacity as a Detective Sergeant and Officer in Charge, utilized social media (Facebook and TikTok) to subject Plaintiff to public humiliation.  By allowing a high-ranking officer to publicly disparage a subordinate without discipline, the City effectively sanctioned a hostile and humiliating work environment

174. Following Plaintiff's protected reports, her professional development was intentionally halted.  Management restricted Plaintiff's duties exclusively to processing police reports, while

32

all other essential job training was terminated.  This constitutes a material adverse change in the terms and conditions of her employment.

175.. On March 27, 2025 Plaintiff requested Public Records

176. On May 20, 2025 Plaintiff received Public Records75. On or about May 23, 2025 Plaintiff contacted EEOC because of what she felt was discrimination, retaliation, lack of due process, defamation and Monel 76. On June 3, 2025 EEOC gave Plaintiff a Notice of Right to Sue Letter. EEOC notified The City of Cleveland that they gave this Letter to me.

177. On August 13, 2025 Plaintiff filed her first complaint in Federal Court

178.. All individually named Defendants (Sgt. Eugene Young, Sgt. Dahlia Lopez, Jennifer Meyer, Dorothy Todd, and Ariel Flores) are sued in both their official and personal capacities.

179.. At all relevant times, Defendants were emplo0yees, supervisors and/or officials of the City of Cleveland and were acting under color of state law within the meaning of 42 U.S.C.§ 1983. Defendants exercised authority delegated by the City of Cleveland over

180. Upon information and belief, Plaintiff has been subjected to repeated harassment and monitoring through multiple fake or anonymous social media accounts, including but not limited to Instagram, Instagram Threads, and Facebook accounts.

181.  These accounts appeared shortly after workplace conflicts involving Defendant Young and were used to make comments and references that closely mirrored private knowledge of Plaintiff's appearance, personal habits, and circumstances, including references to wigs, makeup removal, and other personal details not publicly known.

182. The timing, subject matter, and content of these communications led Plaintiff to reasonably

33

believe that Defendant Young was responsible for, or directly connected to, the creation and use of these accounts. When Plaintiff attempted to disengage by deleting or deactivating her own social media accounts, additional fake or newly created accounts would subsequently appear.

183. As a result of the ongoing harassment and Plaintiff's concern for her privacy and safety, Plaintiff deleted multiple social media accounts, including Instagram, Threads, and several Facebook accounts. Plaintiff was able to preserve screenshots of some, but not all, of the offending accounts before deletion.

184. This pattern of conduct caused Plaintiff significant emotional distress, fear, and disruption to her daily life, and further contributed to the hostile, intimidating, and retaliatory environment created by Defendants.

185. On October 14, 2025, while this litigation was active, the City of Cleveland updated its public – facing Grooming Policy to include language regarding "Wigs" and "Natural Hair" –the specific subject of the discriminatory conduct reported by the Plaintiff.

186. Although the City's website Index confirms this revision occurred on October 14, 2025, the City intentionally retained an outdated "Effective Date" on the policy document itself to create the false appearance that this language existed at the time of the underlying incidents (See Exhibit 26) Screenshot of 10/14/2025 Index and Backdated Policy.

187. Plaintiff asserts this mid-litigation alteration of public records is a bad-faith attempt to manufacture a defense for Defendant Young and constitutes further evidence of a coordinated retaliatory scheme to protect supervisors while justifying the constructive discharge of the Plaintiff.

34

188. At all relevant times, Plaintiff Robin Johnson was an employee of the Cleveland Division of Police.

189. During her employment, Plaintiff utilized wigs/weaves and other protective hairstyles to protect her natural hair.

190. Defendant Sgt Eugene Young repeatedly targeted Plaintiff's appearance, specifically her use of protective hairstyles.

191. These comments included demands that Plaintiff, "remove her "wig or weave" and "just wear her natural hair".

192. Defendant Young's targeted comments regarding plaintiff's hair texture and protective styles constituted racial and gender – based harassment.

193.. In response to this discriminatory conduct, Plaintiff engaged in protected activity by opposing and reporting the harassment.

194. Following Plaintiff's protected activity, Defendants initiated a series of retaliatory actions, including the submission of a false and misleading complaint to Internal Affairs.

## CAUSES OF ACTION

## COUNT I -- VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (All Individual defendants in Their Individual Capacities)

195. As described in paragraphs 1-194, Plaintiff hereby incorporates by reference all previous allegations contained in paragraphs 1-194 as fully rewritten herein.

196. At all relevant times, Defendants acted under color of state law as employees and officials of the City of Cleveland

197. Defendants deprived Plaintiff of rights secured by the United States Constitution, including but not limited to her rights to due process and to be free from retaliation for protected activity.

198. Defendants subjected Plaintiff to adverse employment action without fair procedures and through arbitrary and retaliatory conduct, resulting in loss of employment opportunities, damage to reputation and other tangible harms.

199. Defendants' actions were willful, malicious, and in reckless disregard of Plaintiff's clearly established constitutional rights.

## COUNT II: DISCRIMINATION (Title VII / O.R.C. 4112) AND HOSTILE WORK ENVIRONMENT

200. Plaintiff hereby incorporates by reference all previous allegations contained in paragraphs 1-194 as fully rewritten herein.

201. Plaintiff is a member of a protected class based on Race (African American and gender (Female). Defendants subjected Plaintiff to a hostile work environment through unwelcome, severe, and pervasive conduct based on her race and sex. This conduct was both subjectively offensive to Plaintiff and objectively offensive to a reasonable person in Plaintiff's position.

202. Plaintiff was highly qualified for her position and consistently performed her duties satisfactorily or above expectations. At all times relevant to this complaint, and up to the time of her constructive discharge, Plaintiff's performance evaluations and records demonstrate that she met or exceeded all legitimate employment expectations.

36

**203. Discriminatory and Hostile Work Environment**

Defendants subjected Plaintiff to unequal treatment and a hostile work environment based on her race and gender, in violation of **Ohio Revised Code § 4112**, **Title VII**, and applicable local **CROWN Act** ordinances (e.g., Cuyahoga County Ordinance 2025-0004), including:

**203a. Racial Harassment Targeting Protective Hairstyles:** Defendant Young engaged in a pattern of racial harassment by repeatedly targeting Plaintiff's choice of protective hairstyles. This included:

**203b.Direct Statements:** Young explicitly stated that "Black women should remove their wigs and be themselves."

**203c. Published Content:** Young later published a video **(Exhibit 13)** asserting that Black women should "remove their wigs and weaves and wear their natural hair."

**203d. Legal Context:** These comments constitute race-based harassment as they target traits historically associated with race and are protected under the CROWN Act framework intended to prevent the "professionalism" label from being used to discriminate against Black women's hair.

**203e. Gender-Based Slurs and Intimidation:** Young utilized gender-based slurs and intimidation tactics captured on social media [Exhibit 13] and Internal Affairs video evidence.

**203f. Mocking of Medical Condition:** Young intentionally mocked and physically intimidated Plaintiff regarding her medical condition (Alopecia), using it as a tool for workplace humiliation.

**203g. Disparate Treatment in Investigations:** Defendants utilized "Complaint Form 1" to launch an investigation against Plaintiff that was not applied to similarly situated employees outside of her protected class, demonstrating a pretextual use of disciplinary procedures.

204. Similarly situated male and/or non-African American and African American employees were treated more favorably under *similar* circumstances, including enforcement of workplace policies and disciplinary procedures. Despite Plaintiffs formal reports, the City of Cleveland failed to take effective remedial action. Instead, the City's selective enforcement of policies (GPO 1.1.03 and 7.03.03) created conditions so intolerable they resulted in Plaintiff's **constructive discharge**.

205. Defendants deviated from established policies and bypassed Plaintiffs supervisory chain of command, evidencing discriminatory intent.

206. As a direct and proximate result of Defendants' actions, Plaintiff suffered loss of employment, damage to reputation, tortious interference with future employment opportunities, Defendants caused Plaintiff to be blacklisted from law enforcement careers- evidenced by the Willoughby Police Departments cessation of the hiring process, emotional distress/duress and financial hardship. These damages include, but are not limited to. The effects of constructive discharge, unfair discipline, being passed over for employment by other agencies (including but not limited to the Willoughby Police Department) due to tainted record created by Defendants based on GPOs rather that the CBA, a tainted public record via Internal Affairs investigations, loss of future career opportunities, various ongoing financial hardships.

207. Defendant's actions were motivated by discriminatory intent and any stated reasons for discipline offered by Defendants are a "pretext" for discrimination.

208. Plaintiff brings this claim under Title VII, which, as reaffirmed by the Supreme Court in *Ames v. Ohio Department of Youth services (2025)*, protects any individual from disparate treatment based on protected characteristics using a uniform, national standard.

38

209. Defendants' actions were willful, malicious, and in reckless disregard of Plaintiff's clearly established rights under federal and state anti-discrimination laws.

210. Plaintiff further alleges that Defendants' discriminatory actions violated Plaintiff's rights under the U.S. Constitution, including the Equal Protection Clause, and were committed under color of state law, supporting a claim under 42 U.S.C. § 1983.

**COUNT III: RETALIATION (Title VII / O.R.C. § 4112 and CDP GPO 1.07.07)**

211. Plaintiff hereby incorporates by reference all previous allegations contained in paragraphs 1-194 as fully rewritten herein.

212.. Under GPO 1.07.07 (**Retaliation Prohibited**), the City of Cleveland explicitly prohibits any "adverse action" against a member who "opposes an unlawful employment practice" or makes a charge, testifies, assist or participates in an investigation" of a discrimination complaint. This GPO defines retaliation as any action that would "reasonably' deter a person from engaging in protected activity. Defendants had actual knowledge of GPO 1.07.07 and their mandatory duty to refrain from retaliating against members who report discrimination. By ignoring this policy and issuing "Sustained" findings, Defendants acted with pretextual and retaliatory intent.

213. Discriminatory and Hostile Work Environment

Defendants subjected Plaintiff to unequal treatment and a hostile work environment based on her race and gender, in violation of **Ohio Revised Code § 4112**, **Title VII**, and applicable local **CROWN Act** ordinances (e.g., Cuyahoga County Ordinance 2025-0004), including: a. Racial Harassment Targeting **Protective Hairstyles:** Defendant Young engaged in a pattern of racial harassment by repeatedly targeting Plaintiff's choice of protective hairstyles. This included:

39

**Direct Statements:** Young explicitly stated that "Black women should remove their wigs and be themselves

**Published Content:** Young later published a video **[Exhibit 13]** asserting that Black women should "remove their wigs and weaves and wear their natural hair. "These comments constitute race-based harassment as they target traits historically associated with race and are protected under the CROWN Act framework intended to prevent the "professionalism" label from being used to discriminate against Black women's hair. **Gender-Based Slurs and Intimidation:** Young utilized gender-based slurs and intimidation tactics captured on social media [Exhibit 13] and Internal Affairs video evidence. **Mocking of Medical Condition:** Young intentionally mocked and physically intimidated Plaintiff regarding her medical condition (Alopecia), using it as a tool for workplace humiliation.  **Disparate Treatment in Investigations:** Defendants utilized "Complaint Form 1" to launch an investigation against Plaintiff that was not applied to similarly situated employees outside of her protected class, demonstrating a pretextual use of disciplinary procedures.

214.. Plaintiff engaged in protected activity under Title VII, Ohio Revised Code § 4112, and GPO 1.07.07 when she reported Defendants Youngs discriminatory conduct (social media post, in office misconduct) to Lt Stone and Sgt Gillard in October 26, 2024, and by directly confronting Defendant Young regarding the offensive nature of the posts and misconduct. After Plaintiff engaged in protected activity, Defendants subjected Plaintiff to adverse actions, including initiating and sustaining findings against Plaintiff, placing those findings in her personnel file, and rendering her ineligible for rehire.  These adverse actions would deter a reasonable employee from engaging in protected activity. The timing and circumstances of Defendants actions demonstrate a casual connection between Plaintiff's protected activity and

40

the adverse actions. Defendant's action was intentional, retaliatory and taken under color of state law. As a direct and proximate result, Plaintiff suffered economic loss, reputational harm, emotional distress/duress and other damages.

215.. Defendants violated GPO 1.07.07 and federal law by taking the following retaliatory adverse actions: Initiating a 'sustained" Internal Affairs investigation based on Young's uncorroborated and false Form 1 Complaint, failing to investigate or discipline for his clear violations of the Social Medi and Conduct policies. Creating a hostile work environment that resulted in the constructive discharge of the Plaintiff.

216. The City of Cleveland, through Chief Dorothy Todd and Internal Affairs, ratified this retaliation by ignoring objective evidence of Plaintiff's professionalism and instead using the disciplinary process to silence her opposition to racial and hair – based discrimination.

217. At all times relevant, Plaintiff engaged in "protected activity" under Title VII and Ohio law, including but not limited to: Filing regarding Opposing discriminatory practices; and/or EEOC charges of Discrimination, Retaliation, Defamations, lack of Due Process, HR complaint with Ariel Flores. No grievance officially filed.

218. Shortly after Plaintiff engaged in these protected activities, Defendant took adverse employment actions against her, including being subjected to a retaliatory internal affairs investigation, constructive discharge, the imposition of discipline under GPOs/HR policies **rather** than the CBA for Local 100

219. There is a direct causal connection between Plaintiff's protected activity and the adverse actions taken by the Defendant(s). The timing of the discipline was "suggestively proximate" to the date Plaintiff engaged in protected activity.

41

219A. Defendant's decision to ignore the 2022–2025 CBA's "Just Cause" and **"Progressive Discipline"** standards and instead apply more restrictive GPOs/HR policies was a retaliatory tactic intended to punish Plaintiff for her protected complaints.

220. Any non-retaliatory reasons offered by the Defendant for the adverse actions are a **pretext** (a cover-up) for unlawful retaliation.

221.. As a direct result of this retaliation, Plaintiff has suffered loss of income, benefits, and severe emotional distress

222. Plaintiff engaged in protected activity by formally complaining about Defendant Youngs discriminatory public Facebook post.

223. Defendant had a duty, per the **CBA** and **Internal Affairs (IA) protocols**, to conduct a full and fair investigation, which includes an interview with the accused employee to allow them to address all evidence, including "the Video" presented by Young.

224. Defendant intentionally **denied Plaintiff an Internal Affairs interview**, thereby preventing Plaintiff from offering a defense or clarifying the context of [the Video].

225. This deviation from standard investigative procedure—specifically the refusal to interview the Plaintiff—was an adverse action taken in retaliation for Plaintiff's protected complaints.

226. By bypassing the IA interview, Defendants ensured a one-sided record to justify a harsher discipline under GPOs/HR policies, rather than the "Just Cause" standard required by the CBA.

**226A. Causal Connection and Temporal Proximity**

Plaintiff has sufficiently alleged "but-for" causation as required under *George v. Youngstown State Univ.* (2020). The retaliatory adverse actions were **suggestively proximate** to Plaintiff's

protected activity, occurring within days of her reports to supervisors. Plaintiff reported protected activity on 10/22/2024 – 10/26/2024. Defendant Youngs Complaint Form initiated on 10/28/2024. Internal affairs investigation began on 10/29/2024.

**226B. Imputed Knowledge and "Cat's Paw" Liability**

The City of Cleveland is liable for retaliation under the **"Cat's Paw" theory of liability**, as recognized by the Sixth Circuit in *Marshall v. The Rawlings Co., LLC* (2017).

**226C. Manipulation by Biased Subordinates:** Although the Director of Public Safety may have been the formal decision-maker, he acted as a "cat's paw" for Defendant Young, Sgt. Gillard, and Lt. Stone. These supervisors had direct knowledge of Plaintiff's protected activity— specifically her reports regarding racial and hair-based discrimination—and intentionally used the Internal Affairs process to trigger the adverse action.

**226D. Chain of Command and Reporting:** Plaintiff followed the City's strict chain of command by reporting the discriminatory conduct to her immediate superiors. Under Sixth Circuit law, an employee is not required to bypass their chain of command to notify the ultimate decision-maker personally; knowledge of protected activity by supervisors is sufficient to establish a prima facie case when those supervisors influence the final outcome.

**226E. Lack of Independent Investigation:** The Director's decision was not based on an "in-depth and truly independent investigation". Instead, the Director "rubber-stamped" the biased and false recommendations and "sustained" findings generated by the supervisors who were motivated by retaliatory animus.

43

**226F. Proximate Cause:** The retaliatory intent of Sgt. Young and the subsequent biased reports from Sgt. Gillard and Lt. Stone were the **proximate cause** of the Director's ultimate decision to sustain the investigation and render Plaintiff ineligible for rehire.

**226G. Immediate Retaliatory Chain:** Unlike the cases cited by Defendants (e.g., *Doe v. City of Detroit*), where a several-month gap existed, the retaliatory investigation here was initiated almost immediately after Plaintiff confronted Defendant Young and reported his discriminatory conduct to Lt. Stone on October 26, 2024.

**226H. But-For Causation:** But for Plaintiff's protected reports regarding racial and hair-based discrimination, Defendant Young would not have authored the false IA Complaint Form 1, and the City would not have bypassed its standard investigative protocols to "sustain" unfounded findings.

**226I. Awareness and Intent:** The decision-makers were aware of Plaintiff's protected activity at the time they took the adverse actions, and their deviation from the CBA's "Just Cause" standards provides further evidence that the timing was a direct result of retaliatory intent.

**COUNT IV: VIOLATION OF PROCEDURAL DUE PROCESS (42 U.S.C. § 1983)**

227. As described in paragraphs 1-194 Plaintiff hereby incorporates by reference all previous allegations contained in paragraphs 1-194 as fully rewritten herein.

228. As a public employee covered by a "just cause" provision in the 2022–2025 AFSCME Local 100 CBA, Plaintiff has a constitutionally protected **property interest** in her continued employment.

44

229. Defendants' stigmatizing findings were made in connection with and arose from Plaintiff's separation from employment, and were foreseeably likely to be disseminated to prospective employers, thereby foreclosing future employment opportunities.

230. The Fourteenth Amendment to the U.S. Constitution requires that a public employee with a property interest in their job be afforded **due process** before being deprived of that interest. This includes the right to "notice and an opportunity to be heard."

231. Defendant violated Plaintiff's due process rights by: **Failing to provide a meaningful interview:** Denying Plaintiff an Internal Affairs interview regarding [the Video] deprived her of the opportunity to present her side of the story and refute the evidence before discipline was finalized.

232.. **Bypassing Contractual Safeguards:** By applying a unilateral GPO or HR policy instead of the negotiated CBA procedures, the Defendant stripped Plaintiff of the "Pre-Disciplinary Hearing" protections guaranteed under Article 15 of the CBA. **Lack of Neutrality:** The investigation was conducted in a manner that was biased and predetermined, failing to meet the minimum standards of a fair administrative process, conducted in a manner that was biased and predetermined, failing to provide a neutral decision- maker.

233. The Defendant acted "under color of state law" when its deprived Plaintiff of these constitutional protections.

234. As a direct result of this lack of due process, Plaintiff was unjustly experienced constructive discharge, and has suffered significant economic and emotional damage

At all relevant times, it was clearly established that public employees possess a liberty interest in their reputation and future employment and are entitled to due process when stigmatizing findings are made in connection with their separation from employment without a meaningful opportunity for a name-clearing hearing.

**234A. Involuntary Resignation and Constructive Discharge** Plaintiff did not voluntarily waive her right to a pre-termination hearing or due process. To the contrary, Plaintiff's separation from employment constituted a **constructive discharge** under Ohio law and the Fourteenth Amendment.

**234B. No Voluntary Waiver:** Unlike the plaintiff in *Washington v. City of Cincinnati*, this Plaintiff did not freely resign; she was forced out by an objectively intolerable environment created by Defendant Young's fabrications, the City's refusal to follow the CBA's "Just Cause" protections, and the "sustained" false IA findings.

**234C. Objective Intolerability:** A reasonable person in Plaintiff's position would have felt compelled to resign because the Defendants' actions—including the mocking of her medical condition, the targeting of her hair, and the "blacklisting" of her reputation with agencies like the Willoughby Police Department—rendered her continued employment untenable and her eventual termination a predetermined certainty.

**234D. Denial of Meaningful Process:** Because this resignation was coerced by the Defendants' bad-faith investigation and the intentional bypassing of the Internal Affairs interview, ongoing hostile work environment, lack of training for new position, it was **involuntary**. Therefore, the Defendants' failure to provide a pre-deprivation hearing was a direct violation of Plaintiff's clearly established Procedural Due Process rights under *Bozzo v. Nanasy* (2025).

46

**234E. Rebuttal of Waiver and Qualified Immunity**

Defendants are not entitled to judgment on the pleadings because Plaintiff's separation from employment was a **constructive discharge**, not a voluntary waiver of rights.

**234F Involuntary Resignation:** Under the standard of *Bozzo v. Nanasy* (2025), Plaintiff was deprived of a property interest because her working conditions—including the "sustained" false IA findings and the "blacklisting" from the Willoughby Police Department—threats of prosecution on 10/26/2024, secret retaliatory investigation, no training for new position, were so objectively intolerable that no reasonable employee could have remained.

**234G. Denial of Clearly Established Rights:** The right to a pre-deprivation hearing (*Loudermill* rights) for a public employee with "just cause" protection has been **clearly established** since 1985. Defendants' intentional decision to bypass the Internal Affairs interview and the CBA's pre-disciplinary safeguards was a willful violation of this established law.

**234H. No Immunity:** Because Defendants acted with **malicious purpose and in bad faith** by fabricating allegations to trigger a retaliatory investigation, they are not entitled to qualified or statutory immunity under **Ohio Revised Code § 9.86** or federal law. Their conduct was manifestly outside the scope of lawful employment and intended specifically to deprive Plaintiff of her constitutional and contractual protections.

## COUNT V – DEFAMATION / STIGMA-PLUS

235. (Against Sgt. Young, Sgt. Lopez, Mr. Flores, Ms. Meyer, Chief Todd, and Other City of Cleveland Employees, Plaintiff incorporates by reference all preceding paragraphs 1-194, as if fully restated herein.

47

236 On or about October 28, 2024, Sgt. Young knowingly made false statements in his Complaint Form 1 that initiated an Internal Affairs investigation. Sgt. Young described Plaintiff as "very paranoid, unruly, and exhibiting abnormal behavior," falsely claiming that Plaintiff worked his shift to pursue him, when in fact Plaintiff worked multiple shifts, none directed toward Young.

237. Sgt. Young falsely characterized Plaintiff's protected reporting as "ramblings" and, during the IA interview, misrepresented Plaintiff as "angry" and "furious," invoking a long-labeled racial and gendered stereotype of Black women.

238. Sgt. Young further falsely stated there was "a lot of debate about the end of Plaintiff's probationary period" despite Plaintiff successfully completing probation, and submitted altered documents of communications to IA misrepresenting Plaintiff's conduct. He also falsely claimed he told Plaintiff to stop calling him—a claim for which IA found no corroborating evidence.

239. Sgt. Young additionally misrepresented professional communications as personal or romantic, falsely suggesting Plaintiff acted improperly toward him, thereby harming her reputation and professional standing.

240. On or about February 14, 2024 (also in IAs Final Report) Mr. Flores, in his Incident Summary Report, falsely alleged that Plaintiff participated in harassment, referred to Plaintiff as "Robin Young," and mischaracterized routine work-related communications as personal, creating a false narrative of unprofessional conduct. Mr. Flores also falsely stated that Young tried to redirect Plaintiff when he never did, further misrepresenting the facts.

241. Sgt. Lopez accepted altered documents from Sgt. Young, failed to interview Plaintiff or other relevant witnesses, and issued sustained findings falsely asserting misconduct, implying

criminal behavior, and ratifying Sgt. Young's false statements. Sgt. Lopez also publicly recorded the investigation findings, exposing Plaintiff to further reputational harm.

242. Ms. Meyer, in her supervisory capacity, disseminated or endorsed summaries of the IA investigation, falsely portraying Plaintiff as engaging in misconduct, despite knowledge that Plaintiff's conduct was proper. Ratifying the sham investigation, unprofessional when speaking to Plaintiff.

243. Chief Todd ratified Sgt. Lopez's recommendations and findings, further perpetuating and amplifying the defamatory statements made by Sgt. Young and accepted by Sgt. Lopez, including mischaracterizations of Plaintiff's professionalism, behavior, and communication.

244. The false statements described above were made with actual malice, i.e., knowledge of their falsity or reckless disregard for the truth, and were intended to damage Plaintiff's professional reputation, employment opportunities, and standing within the department. The statements were not mere opinions but false assertions of fact that caused tangible harm.

245. As a direct and proximate result of Defendants' false statements and actions, Plaintiff suffered and continues to suffer: Damage to professional reputation; Emotional distress; Loss of employment opportunities and advancement; Constructive discharge.

246. The conduct described herein constitutes defamation and supports a stigma-plus claim, as Plaintiff suffered tangible harm in addition to reputational injury.

247. Plaintiff therefore requests relief as set forth in the Prayer for Relief, including compensatory and punitive damages, and any other relief the Court deems just and proper.

**COUNT IV: MONELL LIABILITY (42 U.S.C. § 1983 – City of Cleveland)**

49

248. Plaintiff incorporates by reference all preceding paragraphs 1–216 as though fully set forth herein.

249. At all times relevant, Plaintiff was employed by the City of Cleveland and was entitled to rights protected under the U.S. Constitution, including the Equal Protection Clause, and federal law, including Title VII of the Civil Rights Act of 1964.

250. Defendant City of Cleveland, acting through its supervisors, Internal Affairs personnel, and other officials, had a duty to ensure that employees were protected from discrimination, harassment, retaliation, and other violations of their federal rights. The City had written policies governing employee conduct and complaint procedures, including GPO 1.1.03 (Standards of Conduct), GPO 1.07.07 (Retaliation Prohibited), and GPO 7.03.03.

251. Despite knowledge of Defendant Young's repeated harassment, discriminatory conduct, and retaliatory acts—including unwelcome sexual advances, racially and gender-motivated social media posts, physical intimidation, mockery of Plaintiff's medical condition, and sustained false Internal Affairs allegations—the City failed to take adequate remedial action. Supervisors bypassed the chain of command, ignored evidence such as audio recordings and messages, and allowed a hostile work environment to persist.

252. The City's failure to enforce its own policies and prevent harassment reflects a custom, practice, and/or policy of deliberate indifference to discrimination, harassment, and retaliation against employees in Plaintiff's protected classes.

253. The City ratified Defendant Young's conduct by sustaining false Internal Affairs findings against Plaintiff and by failing to discipline Young or otherwise address his misconduct, despite

50

evidence proving Plaintiff's professionalism and refuting his claims. This demonstrates that the violations were knowingly tolerated or officially sanctioned by municipal policymakers.

254. The City's deliberate indifference and ratification directly caused Plaintiff's injuries, including a hostile work environment, emotional distress, reputational harm, financial loss, constructive discharge, and interference with future law enforcement employment opportunities.

255. As a result of the City of Cleveland's policies, customs, and failures, Plaintiff suffered damages, including but not limited to: emotional distress, humiliation, embarrassment, lost income and benefits, reputational harm, and limitations on her professional opportunities.

256. By virtue of the foregoing, the City of Cleveland is liable under 42 U.S.C. § 1983 for violations of Plaintiff's federally protected rights.

**EVIDENTIARY SUPPORT --- Mandatory Reporting & Social Media Violations**

257. These policies prove that my reports were "protected activity" and that my supervisors failed their explicit duties:

**Harassment and Discrimination Protections**

258. Hostile Work Environment was officially recognized by city policy: **GPO 1.1.07 (Sexual Harassment Policy):** Defines harassment as conduct that creates an **"intimidating, hostile or offensive work environment"**. Young's unwanted advances and comments on my appearance fall directly under this city-defined standard. **GPO 1.1.09 (Equal Employment Opportunity):** Holds all management and supervisory representatives **accountable** for compliance with EEO laws. **HR Anti-Discrimination Policy (2024-03-25):** Prohibits any form of reprisal or retaliation for "good faith reports" of discrimination.

**Retaliation Prohibitions**

259. These policies directly contradict the "Sustained" findings against Plaintiff:

260. **Preponderance of Evidence" and "Untruthfulness":** GPO 1.07.06 (Disciplinary Guidance) defines **Untruthfulness** as a major violation. Plaintiff states that by ignoring the voicemail evidence of her claim, cooperative demeanor, used only evidence from Young, never interviewing Plaintiff, the department "condoned" Young's untruthfulness in violation of this GPO. **(See Disciplinary Guidance Policy Exhibit 25)** This policy violated by all Defendants

**Due Process and CBA Violations**

261. These support Plaintiff's argument that the investigation was a "sham":

262. Under the Collective Bargaining Agreement **(CBA) (AFSCME Local 100) & GPO 1.07.06 (Corrective Action Matrix):** State that supervisors **shall follow contractual procedures**. Defendants Young, Defendants Lopez and Defendant Flores's failure to interview Plaintiff, per HR's own summary report is a direct violation of the procedural fairness required by the CBA and the Disciplinary Guidance policy. Progressive Discipline was not used. Supervisors are mandated to follow specific contractual procedural safeguards before issuing discipline. Defendants failed to apply Progressive Discipline as required by the CBA. The leap to "Sustained" findings and the subsequent hostile environment, without any prior progressive steps or a fair investigative interview, demonstrates that the discipline was pretextual and retaliatory.

263. **GPO 1.01.02 (Duties of Command):** States that superior officers shall be held to a **"higher standard"**. Defendant Young (as a Sergeant) Chief Todd, failed this "higher

52

standard" by engaging in or ratifying the hostile environment. (See GPO Duties of Command and Superior Officers) Under Policy Portion discusses being held to a higher standard.

**Grooming Standards as Pretext**

264. GPO Grooming Standards (Revised): The new requirement that wigs present a "natural appearance" is **pretextual coverage** for Young's offensive post. The department's decision to revise this policy *after* Plaintiffs complaint, rather than disciplining the discriminatory speech, is evidence of a retaliatory and biased culture. **(See GPO Grooming Policy Exhibit 24) This Policy violated by all Defendants**

265. Plaintiff performance evaluations shows exceed expectations (See Exhibit 15)

266. Plaintiff Robin E. Johnson was a verifiable due paying member up to her constructive discharge on 12/5/2024.

267. The Collective Bargaining Agreement (CBA) in effect during 2024 for **AFSCME Local 100** and the **City of Cleveland** is the **2022–2025 contract**, which is valid through March 31, 2025. This covers Plaintiff's time of employment up to the closing of the Internal Affairs investigation on March 17, 2025.

268. The **Discipline section** of this agreement outlines several key protections and procedures:

269. **Just Cause Standard:** The City may only take disciplinary action for "just cause".

270. **Progressive Discipline:** Corrective actions generally follow a progressive model, including oral reprimands, written reprimands, suspensions, and discharge. Plaintiff was not given this right before an investigation was initiated.

271.  Although no formal pre-disciplinary hearing occurred due to Plaintiff's resignation, the sustained Internal Affairs findings against Plaintiff constitute an adverse action. The false and retaliatory allegations are recorded in Plaintiff's personnel file and are publicly accessible, harming her professional reputation. These sustained findings have jeopardized Plaintiff's ability to obtain future employment in law enforcement, effectively limiting career opportunities and causing financial and professional harm. As such, Plaintiff has suffered tangible adverse consequences as a result of Defendants' retaliatory actions.

272.  The 2022–2025 CBA is the supreme governing document regarding the terms and conditions of Plaintiff's employment. Because the CBA specifically addresses disciplinary procedures and standards, it precludes the City from unilaterally imposing conflicting standards through General Police Orders or HR policies. Any disciplinary action taken under a policy that contradicts the CBA is a violation of the Plaintiff's contractual rights

**PRAYER FOR RELIEF**

273.  Compensatory Damages for emotional distress, lost wages and reputational harm, lost benefits, reputational harm, and any other economic and non-economic harm suffered by Plaintiff as a direct result of Defendants unlawful actions, including the actions of Defendant Young

274. Punitive damages against all Defendants, particularly Defendant Young, for willful, malicious and reckless misconduct, in order to punish such conduct and deter future violations.

275. Injunctive and Equitable Relief: including, but not limited to, policy changes, corrective measures to prevent future discrimination and retaliation, and reinstalment or other remedial measures as appropriate.

54

276. Attorney fees and cost (if/when they become applicable under federal statues like Title VII or § 1983. **Plaintiff is currently Pro Se**.

277. Any other relief the court deems just and proper, or necessary to make Plaintiff whole and hold Defendants accountable

**Respectfully submitted,**

/s/ Robin Johnson

Robin Johnson

*Pro Se Plaintiff*

2170 Walton Ave

Cleveland, Ohio 44113

216-393-3172

MsIntelligentlady2@gmail.com

**\*\*Certificate of Service\*\***

**I hereby certify that on, this 2nd day of March, 2026, a true and correct copy of this Fourth Amended Complaint was served on all counsel of record by ECF**

**/s/ Robin Johnson**

55